in the Atkinson County district. The case involves two key mandates of federal special education law. These mandates do not speak of exceptions. They do not speak of denial of these as being procedural. The first is child fines, the obligation of the school system that all children suspected of being disabled and needing special education must receive a comprehensive evaluation in all areas of disability. Mr. Barton, who is here in court today, asked 15 times to have his kid evaluated, to have his kid receive special ed over a period of two and a half years. There are no procedural violations under IDA? I'm sorry, Your Honor? Is it your position that there are not procedural violations? Oh, no, there are procedural violations unquestionably. And the special ed law, since this court's decision in Dubois back in 2002, has been specifically amended to identify that there are procedural violations. And it's been explicit, and the regulation is 513, says procedural violations don't give rise to relief if, one, there's no denial of a free, appropriate public education. Two, the parent right to participate has not been significantly impaired. Or three, there's not been a denial of an educational benefit. How can you say that when a child with this level of academic despair, disintegration, emotional disintegration, this kid went from an A, B... created a problem for the child? Correct. Correct. So the ALJ said the failure to evaluate was inexcusable. This is a kid, and the obligation to evaluate is when there's a reason to suspect that the child may be disabled. That's the lowest standard known to the law. I was a prosecutor for 17 years. I would take this case before a jury beyond reasonable doubt. He was an A, B student from first grade through sixth grade. Hits middle school in seventh grade. Immediately begins getting D's, getting F's, getting negative comments. Had never had a single negative comment. But when he went from the small classes in elementary school, nurturing environment, a lot of individual attention, went to middle school, increased class size up to 35 kids in class. He goes downhill. In the next several years, he gets 85 D's and F's over a period of four and a half years with 15 requests from the parent for special letter for evaluation, with 85 D's and F's from a kid who had no problems before that. They knew he was slow in reading and math, but a kid with average intelligence, and all of these problems are surfacing, and there's all these requests for evaluation, and they do nothing. And when they do finally evaluate, after the parents go and get their own evaluation, they find this young man to have a learning disability, to have an emotional disability, to have ADHD. Still, for six months, they don't evaluate. This ALJ conducted about as comprehensive a review of this record as I've seen in some time. He found some real problems with the father's testimony, saying it was shifting and contradictory and all the rest, and some of it was just factual statements. It was just wrong. But the question I had, and I haven't read many records where the appellant's own witnesses provided such damaging testimony to the appellant's case. I mean, these were teachers. Who else was I going to call, Your Honor? I have to call them. Excuse me. I'm sorry. These were teachers that were dealing with him in class day in and day out. They had a much better perspective on him than the experts who seemed to just sort of do once over lightly as far as this case was concerned. And the teachers were ones who had repeatedly recommended people for special education and special education opportunities. But in this case, they were almost unanimous in indicating that the student was not putting forth any effort. Now, you know, there are a lot of struggling students that have a learning disability. There are a lot of, quote, juvenile delinquents, unquote, that have a learning disability. And so I'm not suggesting that every person that fails or come to school or whatever is on that account that lacks a learning disability. I mean, they may have a learning disability. They may not. But that's what we have an ALJ for. And what the ALJ did here was simply was thorough. And the teachers say, We don't detect any kind of learning disability here. The problem is he just won't come to school. He just won't put in any effort. And you can't lay all that at the foot of the school district and say you failed to provide him a free, appropriate public education when he wouldn't make any efforts to get an education at all. Clear error, Your Honor. Clear, factual error. And this is fundamental to this case because both the ALJ and then the district court that simply accepted what the ALJ said, without citation to the record, here's what the record says about him coming to school, Your Honor. The record at 1873, 1900, and 1904 shows how much he attended school in 7th, 8th, and 9th grade when they said he wouldn't go to school. He attended 93% of the time. That was fundamental to their decision. They said, Oh, we will excuse the failure to evaluate to find out whether he is disabled, which they later did, which the private evaluation later did, and found him to be up to six years behind in reading and math, which clearly is a learning disability, and also found to be emotionally disturbed. Those three pieces of evidence, they're the report cards. The district's own report cards show he attended 93% of the time. But the ALJ said, Oh, he didn't go to school. He did go to school. That is clearly erroneous. That's not what the evidence showed. I'm sorry? That's not what the evidence showed. Your Honor, I'm giving you the three report cards of the school district that have his attendance, and it showed he attended 93% of the time for those three years. That can't be ignored. That's their own record that shows, you know, and sure, did he start to lack motivation? Yes. That's an indicia of a disability. And eventually, did he stop going to school in 10th grade? Yes, that is an indicia of disability. That's this court's SG case, and this court's SG case was cited to both the ALJ, where the kid had increasing anxiety, had increasing problems at school, increasing emotional problems, and increasing absenteeism and declining motivation, and this court said all of those are indicia of a disability. Those are not a reason to not evaluate the kid. They may be or they may not be, and that's why you have a finder of fact. You almost want to proceed as if a finding of fact did not, you know, as if it counted for nothing. That's why you have an evaluation, Your Honor. I mean, to be sure, eventually it gets before an ALJ, but that ALJ cannot and no one can engage in clear error. Again, 1873, 1900, 1904, he attended 93% of the time, and they said that's why it's harmless error to not evaluate a kid, to not give him an appropriate program, because, and by the way, if you look, Your Honor, in the ALJ's report, he's not talking about, well, first of all, he said he didn't go to school, which he did, and second of all, when he talks about it at the very end, he said, I'm not going to grant any relief because he won't go to school. He said that at least two or three times in the present tense. The present tense isn't what we were talking about. We were talking about compensatory education, about the failure to evaluate. That gets to the burden that you have in this case, because if we assume, which I think we certainly can for purposes of our argument, and I think both the ALJ and the district court said that it was an error of sorts, a procedural error, if nothing else, not to evaluate a child before they did. It's your burden to show that that failure to evaluate affected the free and appropriate public education up to that time. Yes, sir. That's what I'm having trouble with in your case. You have two experts. I don't see anything in the experts' report that say there was a denial of the education by virtue of the failure to evaluate. In fact, it seems to be quite the opposite. The ALJ gave very little credibility to either of the experts in any event for the reasons that are outlined in the record. For instance, with Dr. Silverman, he met with the student once. He did not perform any testing. He did not perform an independent educational evaluation. He made a written report, never met with the IEP team, never met with the students, never observed the student in an educational setting, was unable to identify any documents that he reviewed, and he was unable to provide any data to support his opinion that the student due to the smaller class. I mean, his whole rationale, as I take it from the record, was, quote, sometimes I get stuff other people miss. That doesn't tell me anything about the evidentiary need to have had a fate before the time they did the evaluation. Well, I would encourage you to look at page, in the record, pages 690 of Dr. McLaughlin's testimony through 700. She is very clear. Wait a minute. I'm sorry, Your Honor. I'm sorry. The ALJ goes through the same review of Dr. McLaughlin that didn't speak with any of the teachers, didn't attend any IEP meetings, did not write a report, did not observe him in a classroom setting. She did not even initially offer a diagnosis of the student. How do you give any credibility to what they said? Because he's wrong. The ALJ simply, I don't know if he read the record. I mean, Dr. McLaughlin, page 690 through 700, does all of those things, and the ALJ said that Dr. Silderman did not identify the student as having learning disabilities. He did. The ALJ... So did those experts interview the student for more than an hour? Did they give him any tests? No. No, because the basic... Did they talk to his teachers? No. Did they ever observe him in school? No, and neither did the IEP team that met with the IEP team that... We're talking about your experts. Yes, sir. You're a burden. Yes, sir. You have to prove this. Yes, sir. What I'm trying to get at is, why would the experts that you presented be credible? Because they had reviewed all of the student's records. They had met with the family. They had met with the young man. The record says, at least to Dr. Silderman, he couldn't even identify those documents. I would respectfully submit, Your Honor, that if we look at the record, that's not true. I mean, unfortunately, and I recognize this was a long ALJ opinion, but there were a lot of contradictions, and especially when you talk about the question of him going to school. May I quote, Your Honor, from the Supreme Court's decision in Forest Grove? Because this is really important. The Supreme Court in Forest Grove said, the school district's reading of IDEA is at odds with the remedial purpose underlying IDEA and its amendments. The express purpose of the act is to ensure all children with disabilities have available free appropriate public education. Their position conflicts with IDEA's child find requirement, which is what we're talking about here, Your Honor, pursuant to which states are obligated to identify, locate, and evaluate all children with disabilities in the state that require special ed. A reading of the act that left parents without an adequate remedy when a school district unreasonably fails to identify a child would not comport with Congress's acknowledgement of the paramount importance of properly identifying each child. So is it your position that the failure to evaluate axiomatically leads to a denial of a free and appropriate education? Assuming, Your Honor, and assuming that there is evidence that the child was in fact disabled, and I submit that the evidence in this matter is overwhelming. So you don't have the burden to show that had a faith been provided that that would have made a difference? No. No. Because that is a non-delegable duty under the remedial statute. They must provide it. To say that the child wouldn't have benefited if IEP had been given is entirely contradictory to the remedial purpose of IDEA. And that's why Forrest Grove went on to say by immunizing a school... I'll give a short and a long answer if I may, Your Honor. I don't believe we have that. We have a burden to show that an IEP to meet his needs must have been in place. Dr. McLaughlin, in her testimony, set out exactly what that would be. It would be a research-based reading, writing, and math program, and it would have been counseling. She says it in detail. Despite what the ALJ said, she said it in detail in those 10 pages. This is what a free, appropriate public education for this young man would be. The ALJ said that regardless of what IEP was set forth, regardless of the accommodation made, regardless of the class size, the student was not going to attend school. He just was not going to come. And that's the ALJ's conclusion, that the denial of an educational opportunity is not the school's fault, it's not the teacher's fault. You can't get an education if you don't come to school. You can't get one, at least not in the public school system. You may be able to, there may be alternatives, but you cannot get a free, appropriate public education if you just don't try, if you never come to school. And one, with all due respect, Your Honor, IDEA points out that education can take place out of school, but the fact is he was in school during the time in question. The time in question was while he was not being identified, that four-and-a-half-year period. For three-and-a-half years, he attended school. He attended 93% of the time. That's a clear error. I'll ask you, I think my colleague may have already asked this. Are you contending that every student who is struggling, who's having difficulty with classes, should, that that student is automatically a candidate for special education? Of course not. But where a child has had... Well, then, if there's nothing automatic about it, and there's no per se rule that every disciplinary case or every person who is attending, who is struggling in class, is not automatically a candidate for a special education, then the question comes, how do we separate those who are and who aren't? And isn't that what you have a fact finder for? Part of which is to determine the whole question of causation. Was it the fault of the school district? Did they breach a legal duty? They did breach a duty in not testing them. LJ said that. I would agree with you on that. But then there's the larger duty, which is fundamental to the statute, about whether they failed to provide him a free, appropriate public education. And it almost seems to me that we get into the position of saying that every procedural violation or every testing violation automatically amounts to the denial of a free, appropriate public education. I don't believe that's what our case law says. You have to show the flaws in the process, that the flaws in the process somehow contributed to the fact that he couldn't get a free, appropriate public education. And that's what you have a fact finder for, and that's where I have the most difficulty with your case. It's causation. With all due respect, Your Honor, there is no causation requirement of IDEA. It is a non-delegable duty on the part of the school system to offer an IEP to every child that has a disability and needs special ed, and that's what the evaluation is for. That is one obligation, but there are hierarchies of obligations, and the ultimate statutory obligation is to provide the child an education. And they couldn't do that if he didn't attend. And the ALJ says no matter what accommodations were made, no matter what tests were taken, no matter what class size were provided, no matter what programs were set forth, he won't go to school. He won't make an effort. He won't try. But, Your Honor, the question of whether he made an effort or not, that's a manifestation of a disability. And the question of whether he would go to school, he went to school. He went to school. These were teachers who testified without contradiction that they had referred many, many struggling students to special education, and they were not in the habit of just saying, oh, well, he's a struggling student, or he's a disciplinary case, therefore we're not going to think of him as special education. They were discerning people, those teachers, and they referred a lot of them to special education when they were having trouble with homework and the rest. But nobody, none of these witnesses suggested that this was a candidate. This is the person who heard the evidence, that this individual was a candidate for a special education as opposed to somebody who just wasn't trying or wasn't making an effort. And these are from people who looked into the case, who were with him day to day, and who had referred many students to special education and were not insensitive to the needs of struggling, many struggling students for special education opportunities. That's the problem here. One of the teachers said if I'd known that he was failing in the other classes, I would have sent him for a special ed evaluation. What page of AOJ's opinion was that? I can't stand here. I can tell you that one, and I'd be happy to do that. The other thing about it is that there was a, you know, there's almost some contempt for the educational process here. I mean, there was texting and talking and everything. Well, okay. But what really, one of the things that really upset me was one of these teachers was a transgender individual and she wanted to be referred to as her present in her present situation. And he kept referring to her as mister by her birth gender. That's just meanness. And it's part of a contempt for the educational process rather than even a modest effort to make some, to take some advantage of what these teachers were trying to offer and instead sits there in class in front of other students insulting this woman in an unpardonable way. I'm certainly not going to defend anything like that. What I will say is that unfortunately, Your Honor, these are manifestations of emotional disability which are part of the special ed law, which are things that we're supposed to be responding to. I certainly would never suggest anything like that as appropriate. But we have to look at the kids' needs and try to save a kid. That's what we're here for. That's what this is about. It's how to allow a kid to get past those things and to be a productive member of society, which he can be. If you try. And motivation is part of a disability, unfortunately. Unmotivated people often have a disability, especially when you combine it with horrible grades, with a parent begging for an evaluation. But not every motivational problem, and because there are zillions of students, unfortunately, that have motivational problems during their time in school. Some of those are due to learning disabilities, and I grant you that. And a great many students' struggles are due to learning disabilities. And disciplinary problems can be due to learning disabilities. But this is about the worst record I've seen in terms of teachers saying, No, we don't think he's a candidate for special ed. It's just the fact he won't do anything to help the system, help him. And we would have done if he was evaluated, for sure. And that's the problem, with all due respect to him. I've exceeded my time. Thank you. Anything else, Bo? Good morning. May it please the Court. I'm Andy Nussbaum, and I represent the Court of Education in Prince George's County here. I want to point out a couple of things in addition to what the Court has pointed out in this case. First of all, notwithstanding the consistent and constant refrain in the briefs, not spoken today in oral argument, but the appellants in the brief constantly talk about this being a case where the school system has been excused basically on the basis that the student is beyond help. And they keep putting beyond help in quotes in the briefs as if to suggest that the ALJ or the district court judge found that the school system should prevail because the student was beyond help. This case is not about that. I want to make it absolutely abundantly clear. This is not about a student who is beyond help. This is a case that's based on the facts. It's based on the facts that were before the ALJ. It's about the factual record that was put on before the ALJ. It's about the burden of proof that's on the parents to prove their case. And with all due respect, and also I'm not unsympathetic to children and to parents who have children who have special education needs, this is not a case that turns on this notion of beyond help. The record shows what the record shows. Now, Mr. McAndrews told you a couple times, he used this word, well, that's a manifestation of the student's disability. You know, he's not going to class, he's not having motivation, he's belittling a teacher. That's a manifestation of his disability. That's not in the record. This whole case is about what's in the record. You know why it's not in the record? It's not in the record because your school system ignored the cries of his father. Wait a minute. It's not in the record because your school system ignored the cries of his father for years. I disagree. You disagree? Yes, sir. October 2012, the not-the-parent report that has memory problems, problems keeping up, his frustration, he still sees a down slide. We want our child to be tested. This is not even a question about fines. You didn't have to fine him. A father who loved his son came to you and showed you his son. He said, test him, please. You wouldn't even do it. Yet you come here. It's like saying you closed the schools, for example, in Prince Edward County for five years, and then you wonder why the person can't read after that. I wonder what would have helped if he could have been in school five years. I don't know. We don't know because right now you couldn't prove whether or not he would have been able to read or not on his own. That's the record. The record, he was crying out at his father for help. Why didn't you test him? You loved him so much as a student. Why didn't you test him? What the record shows. October 2012. I understand that. And what the record shows, what the ALJ found. I'm not talking about the IG. It's about the record. It's not about the IG. Everybody put it on there. The justice occurs in the record, not from the mouths necessarily, what he put down on a piece of paper. I'm talking about the facts. Because my dear colleague has talked about this kid and excoriating him. In many instances, he's the worst and that kind of thing. I want to give him the facts. October 2012, did not his father ask for him to be tested? That is in the record, Your Honor. Not in the record. Did he not? I don't have any dispute about that. What do you mean, did he or did he not? Yes. Yes, he did. And what was the response of the school system? What was the response of the school system? Answer my question. At that time, he was not tested. Why not? Because it was determined, as the evidence also showed, the testimony of 10 different teachers who testified that when they observed the student, he did not need to be tested for special education. These teachers testified that they were aware of special education needs. They were aware of what students required special education. They had referred kids for special ed testing in the past, but that with this particular young man, he didn't require special education testing. Even though his grades just changed like that? Your Honor, there was a hearing that lasted six days with 21 witnesses, I think it was. What you are looking for, I believe, with all due respect, is support in the record that doesn't exist. What this record does not have, Your Honor, is expert testimony that says, if this kid were tested, this is what likely would have happened, that this kid had a manifestation of a disability that manifested itself in such a way. There's nothing in the record to suggest that. You know why? Because you can't. You can't tell when you've deprived somebody. Wait a minute. When you've deprived someone and taken their heart for years of failure, never answering them, you can't tell what he may have been, what she may have been. Your Honor, with all due respect. With all due respect. I don't need your respect. You can answer my questions. I will answer your questions. What did you say? I will answer your questions, Your Honor. Well, then be quiet. Be careful, counsel, okay? You should be very careful. What I'm asking you is this. When you deprive a kid of the time for him, development years, to actualize what his potential is, how can anybody really in good faith say what he may have been or what she may have been if you had addressed them at the proper time? How can you really do that? Your Honor, my response is this. Go ahead. Child fine can be a procedural violation under the IDA. A procedural violation, as this Court has determined in the Debuo, I always pronounce that wrong, Debuo v. Board of Education of Worcester County, has determined that in order for a procedural violation to be supported, there must be a finding that the procedural violation actually interfered with the provision of a fate. That has to be proven by the parents who have the burden of proof. That was not proven in this case. I have been involved in other cases where parents have brought expert witnesses, where expert witnesses have testified, where there have been testimony in the record and other documentary evidence to show that a procedural violation did, in fact, have an adverse impact on the student. That evidence doesn't exist in this case. That's the response that I have to your question. Did his grades get better? He did not do well because he didn't do well because of what the teacher says. And when Mr. McAndrews points to the report cards, I would point out the hearing of the Administrative Law Judge's findings at pages 16 to 17, where he goes through class by class by class of all the days that this young man missed class. Now, the report card may have shown that he came to school, but he skipped class. And, again, I'm just going by the record. There's no evidence in the record to show what Mr. McAndrews is arguing, that this was evidence of a manifestation of his disability. That's not in the record. Did you find that he had emotional disturbance? Ultimately, well, two things, Your Honor. Yes, I'll answer that question, then I want to say something. Yes, that was the finding. And what year was that? That was in March of 2015. Three years later, you found out he was emotional disturbed. But, Your Honor, if I may, if I may. And this goes to something I wanted to bring up, too, which is that Mr. McAndrews in their briefs used this phrase inexcusable, which the ALJ used in his findings. But, again, the appellants misquote and misconstrue how that word was used because they argue, and he did it earlier this morning, that the ALJ found that the failure to test was inexcusable. That's not what the ALJ said. What the ALJ said, and I'm referring to JA-31, is that the failure of the school system to timely respond to the requests, not failure to test, but the failure to timely respond, was inexcusable. That's different. He also said, and this is important, Your Honor, if I may be given one more sentence here, the ALJ found, quote, most if not all of the witnesses testified that they had referred students for special education services in the past or that they were prepared to do so, but there was no reason to suspect. Counsel, it wasn't just that. I don't think this is your strongest ground because it wasn't just that they failed to respond to the parents' request. The ALJ said that they erred in failing to respond to the parents' request and conduct timely evaluation. No, I understand. I understand. Now, what do you make of the phrase conduct timely evaluation? Well, he also said two other things which are important. The ALJ cited the testimony of Vincent Tepe, T-E-P-E, who's a school psychologist, who testified that the decision ultimately to test was based on, quote, new information that came to us during the meeting itself, not information that was there before, but information that came up at that meeting. Tepe testified there was no reason to suspect a disability, no suspicion of a behavioral issue, and no evidence of an emotional disability prior to that. Where are you reading from? Well, this is, okay, so on JA4849, this is what I'm leading up to, the ALJ concluded, and this is significant in my view, the fact that the IEP found TB, the student, to be eligible for special education in March 2015, quote, simply provides no basis for a conclusion that he was eligible for special education services prior to that date. So, again, what the ALJ found as a factual matter is, yes, in March of 2015, he was found to be disabled and eligible for services, but there was nothing, no conclusion, no basis for a conclusion that that would have been the case prior to that. All right, okay. Three years. Three years ago, he asked for help. The father asked for help. In 2012, he did. In 2015, three years later, he found it. So you're saying, what changed? You said, didn't he, weren't the teachers reporting that supposedly he didn't have, putting forth effort in 2012? Well, there were some, there were some. Weren't they saying the same thing? There was some testimony that in January, I'm looking at my notes, Your Honor, and I apologize, and I wasn't involved with the hearing. I'm new to the case after the hearing, so that's why I'm not quite as familiar with the record. But I know that in January, for instance, of 2015, the parents for the first time reported that they kept the student out of school due to anxiety. Before that, as the ALJ noted, the father had given conflicting claims as to why the student was not attending school. The father said that there was noise, that there was asthma, that there was panic attacks. But at no time did the father indicate prior to that that the student was out of school because of anxiety or depression or any kind of emotional difficulty. But he talked about memory problems back in 2018. No, I understand that. I understand that there were issues. And the school did have conferences. There was a conference. When was this conference? They had an IEP one time scheduled and didn't even properly constitute it under the law. Well, but that issue wasn't before the ALJ. Yeah, but I'm talking about in terms of the whole thing that we have to extrapolate because for so long the school system ignored the attempts of the father to get help. Well, again, Your Honor, I would disagree with that. The school said they had a parent-teacher conference. There were meetings and there were discussions in the school. There was not testing. I absolutely agree with you, Your Honor. That doesn't comply with the IDEA. It was not testing. That doesn't comply with it. Well, the IDEA, the child fund provisions of the IDEA do not require that every struggling student be tested. We're not talking about everyone. We're talking about one who just precipitously changed at sixth grade. In other words, I don't know, maybe I used to represent school systems for 14 years and do stuff, but I'm not trying to put it in a way that's interesting. A lot of teachers would be concerned, like, wait a minute, what is going on? I need to know, too. I would want a test. Why would I resist it? It's just amazing how, you know, particularly fathers get overwhelmed. Here's a father here who's not a predominantly participating. He's showing that I want to be proactive and I'm begging to just test my son. He said, I want to save him. I want to save my son before he gives. That's what he said. Your Honor, I understand that. But the other thing is that the ALJ, and, again, I'm only going by the facts that are in this record. That's what I'm relying on. And the ALJ found specifically that he gave little weight to the testimony of the student's father in this case because he says that the father's testimony was frequently shifting or contradicted by the testimony. The parent is the best evidence in any case dealing with a child. Except when the ALJ says, I put little weight on his testimony. He says his testimony on every. That's absurd. I mean, you put a weight on it of a parent? We're not talking about a parent who just comes in and out. A parent since 2012 has been begging you and you put little weight on the authenticity of their plea for their child? I don't understand. I mean, I find that almost just incredible on the record to say that. Your Honor, the fact finder is the person who sees the. . . The fact finder is still. . . I mean, we certainly can't. . . Common sense and justice has to have some place there. It's like saying. . . I don't know, a parent. It's like telling me. . . Someone tell me, my parent or my three daughters, oh, you know, I don't trust you at all in terms of having any best interest in your child. I don't trust you at all in terms of making an observation. You know how brave it takes for somebody to say my child needs to be tested? A lot of parents don't even want to do that because of, unfortunately, because sometimes of stigma. You have to go through a lot. You just don't put your child through that because, hey, why don't you go down there and be tested? You have to say, I've seen my son. He's about to give up. And you discount that? On this record, for three years, you didn't test him, and you discount that, and you find him on your own record, he's emotionally disturbed. I find this unconscionable in terms of justice in a case like this. Your Honor, again, I'm focusing on the facts. I'm focusing on the record. I'm trying to focus on justice in terms of. . . I thought Congress meant this to help kids in school. But this Court has held on a number of occasions that the findings of fact that are made by an administrative law judge in these cases are to be considered prima facie correct, that the courts are not to substitute their opinions of sound educational policy for that of the educational authorities. And, again, I understand what you're saying. I perfectly well understand it. I've been involved with special education cases my whole career, and I know what happens in these kinds of cases, and I understand what you're saying about parents. But, again, when a case reaches this level, the question is what has the administrative law judge found as a matter of fact? And those factual findings need to be considered prima facie correct. And the ALJ in this case specifically found that the father's testimony, quote now, on almost every factual matter was unreliable and subject to frequent revision. That's what the ALJ found. That's what he found after analyzing the evidence. The ALJ also gave very little weight to the expert witnesses. And, again, I'm relying on the facts. There were two expert witnesses who testified on behalf of the parents. Neither of these expert witnesses gave testimony that was credible enough for the ALJ to find basically that the failure to test gave an adverse impact on the student's education. That's a matter of evidence. That's a matter of fact. This proceeding today is not an opportunity for the parents to put on new evidence. The evidence that was put on is the evidence that was before the ALJ, and the ALJ reviewed the evidence, weighed the evidence, considered the evidence, and made the findings that he made. Well, I mean, the school system is not wearing a halo in this kind of situation. I understand that. And, you know, you have goofed up. And you should have responded in a more timely fashion to what the father was saying, although what the father was saying is unclear, and you're right to read from that part of the testimony, or the ALJ's review of that part of the testimony. But they should have done the testing. The problem is simply one of proof of causation. What did the failure to test result in? Did the failure to test deprive this child in any way of what he's entitled to under federal law, which is three appropriate public educations? And the ALJ's finding, as you point out, it was a six-day proceeding. Twenty-one witnesses. And the amazing thing about the witnesses is both the parents' witnesses and the school system's witnesses come to the same conclusion. The only ones that didn't come to the conclusion were the experts, who didn't even look into it hardly. And the summation is, as discussed below, whether with testing, with or without an IEP, with an IEP providing a small self-contained special classroom with only eight to twelve students in the class, the student would not go to school. And no matter what accommodations are provided, no matter what testing is undertaken, he won't go to school. It's almost as simple. You simply can't provide an education to someone who refuses to attend school. Now, it may be that the refusal to attend school is due to a serious learning disability. And in that situation, the school district is totally at fault and all the rest. But, as you point out, these are ten or twelve teachers who have testified. They have referred students for learning disabilities. They understand what special education is all about. And none of them said, this is a matter of a learning disability. What they said is, this is a matter of lack of effort, lack of motivation, unwillingness to go to school. And there's no suggestion in these teachers' testimony that this is really a matter of a learning disability. Can I add one thing? I know my time is running out. And I just want to point out one more reference, if I may. On JA-167, this is the district court's decision after reviewing the record, too. The district court said, quote, in sum, the court cannot say that the school overlooked clear signs of either a learning disability or emotional disability. And with the last ten seconds that I have, I'd just like to indicate that I believe that this case turns on what's in the facts, what's in the record, and what the ALJ found in his findings. I would suggest that the credible evidence in this case supports those findings and what they support, too. What does the record show in terms of the onset of the emotional disturbance? I'm sorry? What does the record show as what's the onset of the emotional disturbance? I'm not sure that I have an answer for you right off the top of my head. Because even you found that. So what's the onset? Well, I think what Mr. Tepe testified to is that they received information on the day of that IEP meeting that led them to conclude. I think it had to do with reports from the parents about anxiety. And at that time, they decided that he needed to be tested. Once you test, though, any idea what the onset is? I don't know that there was any specific. It could have been back in 2012. Well, again, that's the burden of the parent. I don't know because I'm not sure what the record shows. We don't know because you didn't test it. Well, we don't know because the evidence didn't show it. I guess I'm saying you'll benefit from your breaking the law. Well, I would disagree with that. Do you think that you have to have a need of exceptional education that has to be proven before you can get a test? That would become absurd, wouldn't it? No. What is the standard? If you ask for a test, what do you have to show? Well, I think the child find obligations are that if the school system determines that there are indicia that testing needs to be provided, it should be given. Well, precipitous drop in academic performance is an indicator, is it not? Apparently we're not. We're insufficient indicators in this case for the school to go ahead and provide testing. Why? Why for this child? I can't answer that question. I can't either. I wonder why because he did so well and all of a sudden he's stuck. Any repeated grades? Well, why for him? I don't know. I can't answer the question. But, again, those answers were up to the parents who had the burden of proof, in this case, to show the administrative law judge why that was the case. Why was it the case that his teachers didn't refer him? Well, why? Yeah, I mean, if there was a violation of the ‑‑ it was their burden to prove a violation of the IDEA. It was their burden of showing that if there was a violation that it adversely impacted his education, impacted his educational opportunities. Well, so there's no shifting when you, when it's clear that it shows it. I don't see how you could just benefit from that. That means that, hypothetically, just ignore the problem until you can't, you know, and then if you can't, enough years pass by when you can't connect. I don't agree with that. I'd say it's a hypothetical. I'd ask you to agree with my hypothetical. Okay. Can you answer my question, deal with a hypothetical? I mean, is that, would that be, would that benefit the person who violated the law? I don't know. Because, otherwise, the person, let's say, for three years, they said, needed testing, needed testing. Well, I don't think so. Needed testing. I don't think so. I don't think. And then, finally, when you get around to testing, you say, well, wouldn't it have made a difference, anyhow, if I had tested and I was appointed? Well, no, Your Honor. If I can answer that hypothetical this way, if that was the case, if the parents, after three years, file a due process request hearing and have witnesses, expert witnesses, who are credible, who are believable, and who testify that the onset of this disability was three years ago and you should have tested then, and you should have received a program that had this service, that service, and this service, and as a result of him not receiving those services, this is what happened, and as a result of that, he is eligible to receive compensatory education services of A, B, C, and D, and put on a case to show that, it may be a different situation. But, again, that's the record, and that's the facts. What they could have done is they could have done, if teachers had detected a special learning disability, if expert witnesses who had actually given the case some time had come in and credibly attested to an educational disability, the parents would have won their case. Maybe. But they didn't make the case. It wasn't in the parents' testimony. It wasn't in the experts' testimony. It was nowhere in the teachers' testimony, but it's not that hard to get experts who will actually look at the situation or parents who will provide more detailed testimony or some teachers somewhere that will say there's a learning disability that's at the heart of these motivational and disciplinary problems. But that wasn't in the record. And, of course, here it wasn't a learning disability. It was an emotional disturbance, and the ALJ, and I'm not going to get into all this because that's not really part of the appeal, but the ALJ talked about the private report that the parents got that he basically rejected also because it was so contradictory and kind of convoluted. But anyway, I'm way over my time. I don't know if anybody has any other questions. Thank you very much, Your Honor. Thank you. I can answer your question, Chief Jeff Gregory, about the question of how far back he was disabled in two ways. First, the school district's own psychologist said he was disabled a year prior to when they evaluated him in the spring of 2015. That's their testimony at 1563 to 1564 of the record. So there's no question that he was disabled before, and he should have at least gotten compensatory education from the time that their own witness said he was disabled. 1563 to 1564, Mr. Tepe testified he was disabled back then. That's apart from the other evidence, which to me, I would respectfully submit, clearly shows the presence of a disability. Is it correct that at that point they offered the child a compensatory education program, but that he did not participate? That was a settlement offer, Your Honor, made outside the presence of counsel, which was, with all due respect, of almost no value to this kid because of how it was offered and where it was offered, and so was rejected. I mean, that was not a meaningful compensatory education offer. It was a settlement offer that then the ALJ let testimony come in about, which I thought was error, but beyond that, compensatory education is for past failures, and it's in a manner that the parent can select for tutoring. And again, it doesn't have to be in school. It typically isn't. It's for counseling, for therapy, for tutoring, for vocational training. And by the way, Judge Wilkinson, your questions about and comments about teachers and their testimony, ironically, when the school system had the first meeting, when the first begging of TB's dad, none of the teachers attended. Everyone at that meeting where they first denied testing, as they did 15 more times, had never met him. Nobody from the school system had ever met him when they had a meeting with the mother, and even though these meetings are supposed to be scheduled at a time that the parents can attend, when the father said, can I have another time to attend, he said, no, we'll have it without you. So he had to send the mother alone with a cavalcade of people who had no records about him and who'd never met him. With regard to the school psychologist also testified that TB had made no progress at any time since middle school, and the ALJ did not discount the father's emails and requests for help. He may have discounted some of the father's opinions, but he never discounted, which he couldn't, the father's requests for help. Dr. McLaughlin was very clear in her testimony about what kind of instruction he needed from the start, and that's at page 699 through 702. Very clear, specially designed instruction, research-based instruction, reading, writing, math, counseling, occupational therapy evaluation, extended school year services. The ALJ said she didn't. It's there in black and white. The ALJ said Dr. Silverman didn't identify as being learning disabled. It's there, it's noted in our brief, it's there in black and white. He discounted the independent evaluation by basics because they said their individual treatment plan, which was done before there was any testing, was simply counseling, conflicted with their later educational testing. Well, because there had been no testing when they did the treatment plan, he called their treatment plan an IEP. Just a fundamental misconception of the document, and frankly, of special education. I would move back again to Forrest Grove, and Forrest Grove said you cannot give parents a situation where there is no relief, where a school district fails to properly identify. I've exceeded my time, and I apologize. Thank you. Thank you. We will ask the clerk to adjourn the court for this morning, today, and then we'll come down and recount.
judges: Roger L. Gregory, J. Harvie Wilkinson III, G. Steven Agee